give its decision due deference, but we cannot affirm a decision when an improper standard of law has been applied, and when important factual findings are not supported by substantial evidence in the record as a whole.

*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2000 FED App. 0369P (6th Cir.)
File Name:  00a0369p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

HARBORSIDE HEALTHCARE,
INC.,

  *Petitioner/
Cross-Respondent,*

  Nos. 99-6050/6250

  *v.*

NATIONAL LABOR RELATIONS
BOARD,

  *Respondent/
Cross-Petitioner.*

On Petition for Review and Cross-Application for
Enforcement of an Order
of the National Labor Relations Board.
No. 8-CA-30592.

Argued:  August 10, 2000

Decided and Filed:  October 18, 2000

Before:  KRUPANSKY, WELLFORD, and BOGGS,
Circuit Judges.

1

---

**COUNSEL**

---

**ARGUED:**  Lawrence B. Fine, MORGAN, LEWIS & BOCKIUS LLP, Philadelphia, Pennsylvania, for Petitioner. Jeffrey Horowitz, NATIONAL LABOR RELATIONS BOARD, APPELLATE COURT BRANCH, Washington, D.C., for Respondent. **ON BRIEF:** Lawrence B. Fine, Jennifer M. Calabrese, MORGAN, LEWIS & BOCKIUS LLP, Philadelphia, Pennsylvania, for Petitioner. Jeffrey Horowitz, Aileen A. Armstrong, Charles P. Donnelly, Jr., NATIONAL LABOR RELATIONS BOARD, APPELLATE COURT BRANCH, Washington, D.C., for Respondent.

---

**OPINION**

---

HARRY W. WELLFORD, Circuit Judge.  Harborside Healthcare, Inc. ("Harborside") operates a 274-bed long-term care nursing home in Beachwood, Ohio.  The Service Employees Union ("Union") petitioned the Regional Director of the National Labor Relations Board ("NLRB") seeking certification as the exclusive collective-bargaining representative of Harborside's service and maintenance employees at this facility, on August 5, 1998.  One of Harborside's charge nurses, Robin Thomas, a licensed practical nurse ("LPN"), engaged in pro-union activity, as found by the hearing officer, even after being told that she held a supervisory position and must terminate her campaign efforts for the Union.

The Regional Director conducted a secret ballot election on October 1, 1998, which resulted in forty-nine votes in favor of union representation and thirty-six votes against.  There were also two challenged ballots and one void ballot.  A change of six votes (about seven percent of votes cast) would have brought about a different result.  Harborside timely filed

was clearly wrong--Thomas resigned *after* the election on October 2.  There is a serious question whether Thomas did, in fact, give such "hints," or more than just "hints," of "promise of benefit" or "threat of reprisal" on this record, not as carefully parsed by the hearing officer.  This circuit's requirements do not include direct promises or threats or coercion but rather the existence of supervisory authority and opinions on the extent of its exercise.

We have gone into some detail on these precise Sixth Circuit standards because they differ from the standards applied by the hearing officer and the Board.  The question as posed in *Evergreen* is whether Thomas' conduct "reasonably tended to have a coercive effect" and "was likely to impair [the employees'] freedom of choice," not whether Thomas promised benefits or made threats as determined in error by the hearing officer.  The Board merely "adopted the hearing officer's findings and recommendations" without discussing these crucial distinctions noted.  In addition, we have noted some limited but important exceptions to the hearing officer's purported credibility determinations.

We note also the requirement stated in *St. Francis Healthcare*:  did the conduct in question interfere with freedom of choice so that "it materially affected the result of the election?"  The hearing officer did not discuss this question in his report because he found no hint of threatening or coercive activity, although it was concededly improper, by Thomas.

Because an improper standard was adopted, as reflected in our opinion, we **REVERSE** the action of the Board and **REMAND** for an appropriate determination under the proper Sixth Circuit standard.

We emphasize that we do not overturn an NLRB decision lightly, nor do we reach a different decision from that of the Board based upon credibility determinations alone.  Neither do we intend to usurp the proper authority of the Board.  We

**Hearing Officer's Findings and Conclusions**

The hearing officer's legal conclusions were based upon Board authority (*Pacific Physician Services*, 313 N.L.R.B. 1176 (1994); *Sutter Roseville Medical Center*, 324 NLRB 218 (1997); *Pacific Micronesia Corp.*, 326 N.L.R.B. No. 45 (1998)) that emphasized requirements of coercion and threats in conjunction with other supervisory pro-union conduct. As previously pointed out, our circuit precedent considers neither coercion nor threats as required to taint an election marred by pro-union supervisory conduct, but rather the "degree of supervisory authority possessed" (not necessarily actually utilized), and "the extent, nature, and openness" of such activity. *Evergreen* at 874.

*Grancare, Inc.* discussed in some detail the nature of the duties and responsibilities in a healthcare facility of charge nurses, such as Thomas, who we found exercised "independent judgment" and actual, rather than "isolated" or incidental supervisory authority. 137 F.3d at 375-76. Our court is at odds with the Board in this respect, as the Union organizer noted in stipulating that Thomas was, indeed, a supervisor though she expressed her own doubts on this question. *Grancare* emphasized that while charge nurses may be "low level," they are the "ranking authority" present for much of the time and the immediate supervisors in their department. We do not defer to the Board's precedent with respect to whether a supervisor's pro-union conduct must be threatening and coercive in order to affect unfairly a Board election. "It is the existence of disciplinary authority that counts under the statute, and not the frequency of its exercise." *Id.* at 376 (quoting *Beverly California Corp. v. NLRB*, 970 F.2d 1548, 1550 n.3 (6th Cir. 1992)).

The hearing officer's legal conclusion not to set aside the election was based upon at least a perception that the Board required "some 'hint of retaliation on remand.'" One of the hearing officer's bases for not finding such a "hint" was that "Thomas voluntarily quit before the election." This finding

objections with the Regional Director who ordered a hearing on a portion of the first objections. Harborside now seeks review of the adverse decision of the hearing officer, as affirmed by the NLRB.[1]

Thereafter, the Union requested bargaining, but Harborside refused. The Union then filed an unfair labor practice charge, and the General Counsel then filed a complaint alleging that Harborside violated 29 U.S.C. § 158(a)(5) and (1). Harborside answered, admitting its refusal to bargain but denying the validity of the Board's certification of the Union. Harborside then responded to the General Counsel's motion for summary judgment, which the NLRB granted on July 8, 1999, finding that Harborside violated § 158(a)(5) and (1) by refusing to bargain. Harborside filed the instant petition for review requesting reversal, while the NLRB filed a cross-application to enforce its July 8 order. This Court has jurisdiction pursuant to 29 U.S.C. § 160(e), (f).[2] We now **REMAND** the petition for review for the reasons stated.

**I.  DISCUSSION**

**Standard of Review**

This court reviews the NLRB's "legal conclusions *de novo* and its factual findings under a substantial evidence standard." *Kentucky River Community Care, Inc. v. NLRB*,

---

[1] Hearing officer Randall A. Malloy, after the hearing on December 2, 1998, found that the election was not tainted by pro-union supervisory conduct and recommended that the Board overrule the remaining objections. The NLRB adopted the Director's recommendations and issued an order on February 17, 1999, which certified the Union as the exclusive bargaining representative.

[2] We have jurisdiction to review the Board's actions in the representation proceeding solely for the purpose of "enforcing, modifying, or setting aside in whole or in part the [unfair labor practice] order of the Board." 29 U.S.C. § 159(d).

193 F.3d 444, 449 (6th Cir. 1999), *cert. granted*, ___ S.Ct. ___, 2000 WL 655750 (Sept. 26, 2000). We review the Board's ultimate determination generally for abuse of discretion. *See NLRB v. St. Francis Healthcare Ctr.*, 212 F.3d 945, 951-52, 963 (6th Cir. 2000); *NLRB v. Kilgore Corp.*, 510 F.2d 1165, 1167 (6th Cir. 1975) ("This Court will set aside the Board's determination only if it has acted arbitrarily and abused its discretion.").

> The Board's findings of fact are conclusive if supported by substantial evidence. Evidence is substantial when it is "'adequate, in a reasonable mind, to uphold the [Board's] decision.'" We must consider the record as a whole, including evidence that runs contrary to the Board's findings. Deference to the Board's factual findings is particularly appropriate where conflicting testimony requires the Board to make credibility determinations. The Board's application of law to facts is also reviewed under the substantial evidence standard, and "'the Board's reasonable inferences may not be displaced on review even though the court might justifiably have reached a different conclusion had the matter been before it *de novo*.'"

*St. Francis Healthcare Ctr.*, 212 F.3d at 952 (quotations and citations omitted); *see NLRB v. Main Street Terrace Care Ctr.*, 218 F.3d 531, 536-37 (6th Cir. 2000).[3] "Courts . . . must respect the judgment of the agency empowered to apply the law 'to varying fact patterns,' even if the issue 'with nearly

---

[3] *Holly Farms Corp. v. NLRB*, 517 U.S. 392 (1996), "establishes the standard of review now binding on the courts of appeals in reviewing the NLRB's interpretation of the relevant provisions of the NLRA. Under this standard, our first task is to determine 'whether Congress has directly spoken to the precise questions at issue.' If Congress has done so, we must give effect to its expression. If not, however, 'the question for the court is whether the agency's answer is based on a permissible construction of the statute.'" *NLRB v. Webcor Packaging, Inc.*, 118 F.3d 1115, 1119 (6th Cir. 1997) (quotations, citation, and footnote omitted).

Monica Thyme, also an experienced nursing aide, testified at the hearing that Thomas, as a charge nurse, could discipline her as her "first supervisor" and make evaluations of their work. Thyme had occasional dealings with Thomas and one particular encounter with her about a week before the election which she described as a "confrontation"--"loud" and "intimidating." She felt "slightly threatened" as a consequence, and saw Thomas involved in other Union and "job security" discussions with other employees. Thyme attended a Union meeting at Thomas' urging.

Thomas denied speaking to Pavelchak for the Union, but admitted a "debate" with Thyme, not a "heated discussion," in her view. She also denied any contact with Carter, the Union organizer who contradicted her testimony.

The hearing officer's hair-splitting analysis of the effect of the testimony of Pavelchak and Thyme in particular, and Frank Jackson[6] to a lesser extent, described by him as "my credibility resolutions," is unpersuasive, particularly his reliance upon Carter's testimony to question Pavelchak's and Thyme's essentially uncontradicted testimony. The hearing officer viewed Thomas as merely a "low-level supervisor" with little "impact." At the same time, the hearing officer at one point in his "conclusions of law" acknowledged:

> The assessment of a supervisor's conduct and whether it *could reasonably tend to coerce* employees in their choice of representative depends on the *ability of the supervisor to reward or punish* employees and the extent of the supervisor's pro-union conduct. *Cal-Western Transport*, 183 NLRB 453 (1987), *enf'd*, 870 F.2d 1481 (9th Cir. 1989).

(Emphasis added.)

---

[6] The hearing officer mistakenly identified Jackson as Johnson, whom he found was not threatened, but was merely "encouraged [by Thomas] to support the Petitioner Union."

decided not to join, Thomas "badgered" her on "just about every" encounter and inquired why she was not attending the union meetings. Pavelchak also saw Thomas posting union signs. Although Thomas was her direct supervisor only one day, Pavelchak felt threatened and intimidated when Thomas told her on that day that she would lose her job if she did not vote for the union, because Harborside would fire her for having signed the union card. Pavelchak testified that Thomas would see her in the break room thereafter, and Thomas would reiterate that Pavelchak would lose her job if the union did not get in. Pavelchak, moreover, filed a formal grievance against Thomas on September 30, 1998, stating that she continued to harass her.

The grievance included a reference to an additional incident involving Thomas on September 29, and generally reiterated the episodes related in her testimony. The hearing officer concluded, based on Pavelchak's evidence and that of other employees, Thomas was "involved with encouraging eligible voters to vote for the [Union]." On the other hand, the hearing officer concluded that Pavelchak did not use the same language about her Thomas encounters when examined and cross-examined, and in her written grievance. He seemingly discounted her credibility and the effect of her overall evidence based upon this analysis. We think this both unfair and no basis for questioning Pavelchak's credibility[4] after our careful reading of her entire testimony (including her grievance). This is particularly so in light of the hearing officer's proper finding of a number of inconsistencies in Thomas' testimony.[5]

---

[4] Pavelchak attended four years of college and went through Harborside's training program.

[5] The testimony of Thomas differed, indeed, in important particulars, from that of Carter, the Union representative, as well as a number of Harborside employees.

equal reason [might] be resolved one way rather than another.'" *Holly Farms Corp. v. NLRB*, 517 U.S. 392, 398-99 (1996), *quoted in Grancare, Inc. v. NLRB*, 137 F.3d 372, 377 (6th Cir. 1998) (Moore, J., concurring).

A party who seeks to overturn the results of a representation election bears the burden of demonstrating that the election was conducted unfairly. To meet this burden, "the objecting party must demonstrate that 'unlawful conduct occurred which interfered with employees' exercise of free choice to such an extent that it materially affected the result of the election.'" While the Board strives to achieve "laboratory conditions" during representation elections, we have recognized that this can be an elusive goal, and so "elections are not automatically voided whenever they fall short of perfection."

*St. Francis Healthcare Ctr.*, 212 F.3d at 951 (quotations omitted). Harborside bears the burden of proving that the alleged campaign misconduct tended to prevent a fair election, contrary to the Board's determination.

*Evergreen Healthcare, Inc. v. NLRB*, 104 F.3d 867 (6th Cir. 1997), is the case most analogous to this dispute. *Holly Farms*, the Supreme Court case, involved a different situation: construction of regulations dealing with "agricultural labor employees." *Holly Farms* did not deal with supervisory status and whether supervisory actions during the election process on behalf of the Union preclude a fair election under NLRA.

### Violation of rights by a supervisor

The NLRA gives *employees* "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. The Act provides that an unfair labor practice

includes an employer's interfering with, restraining, or coercing employees in the exercise of the rights guaranteed in § 157 or dominating or interfering with the formation or administration of any labor organization or contributing financial or other support to it. *See* 29 U.S.C. §158(a)(1), (2). The NLRA provides that the term "employee" "shall not include . . . any individual employed as a supervisor." 29 U.S.C. § 152(3). "The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment." 29 U.S.C. § 152(11). In this case, the actions of a supervisor on behalf of the Union, rather than her employer, were the basis of controversy.

Harborside claimed that Robin Thomas was a supervisor within the meaning of § 152(11). The Hearing officer assumed her supervisory status in his opinion, and the Board does not dispute that finding. The Hearing officer and the NLRB, however, may take into account the degree of her supervisory status. *See Grancare, Inc. v. NLRB*, 137 F.3d 372, 375 (6th Cir. 1998) ("The Board has the burden of proving that employees are not supervisors.").

Harborside contends that the hearing officer questioned important elements of the basis of Thomas' supervisory status and that the Board erred in relying on the Hearing officer's conclusions in this regard instead of making an independent determination. "In concluding whether substantial evidence supports the Board's decision, the court must consider the entire record. Evidence which the Board has ignored but is directly relevant cannot be disregarded." *Id.* (citation omitted).

in the election, the nurses curtailed much of their union activity, but when [one] was asked whether her opinions had changed about the union, she replied they had not and she was overheard making several pro-union statements to employees.

*Id.* at 877-78 (citation omitted).

*Evergreen* distinguished *Wright Mem'l Hosp. v. NLRB*, 771 F.2d 400 (8th Cir. 1985), relied on by the Board, because three charge nurses who actively campaigned for the union did not distribute cards or buttons with pressure or persuasion, and "none required employees to sign authorization cards or return the cards to them. In addition, none of the three played leadership roles in the election campaign." *Evergreen*, 104 F.3d at 878. The hearing officer found that Thomas encouraged union support during the critical period and that she spoke with employees about job security with the union. Employer witnesses testified that Thomas continued to try to get them to wear union pins, attend union meetings, sign union cards, and return them to her. The Union organizer, Carter, whose testimony the Hearing officer credited, testified that Thomas turned in all of the LPN unit cards the Union received. *Evergreen* and *River Walk* do not require proof of "some 'hint of retaliation or reward'" as did the hearing officer. The ultimate test is whether the conduct "*reasonably tended* to have such a coercive effect on the employees that it was likely to impair their freedoms of choice in the election." *Evergreen*, 104 F.3d at 879 (emphasis added).

### The Hearing

In the present case nursing assistant Lynne Pavelchak testified at the hearing that charge nurse Robin Thomas "approached me with a union card, in the employee break area, and asked me to sign it, and told me that I needed to come to a union meeting . . . . that I had to . . . attend all of the union meetings so that I could keep up with what was going to be going on," and after she attended the meeting and

constitute objectionable conduct." *Kux Mfg. Co. v. N.L.R.B.*, 890 F.2d 804, 810 (6th cir. 1989). *Evergreen* held that the Board erred in concluding that the supervisory nurses had merely expressed their opinions regarding the union, because, as this court noted, the supervisors "campaigned actively on behalf of the Union. They wore union buttons to work, attended union meetings, handed out union buttons, distributed authorization cards, and spoke about the Union at union meetings." *Evergreen*, 104 F.3d at 876-77. Thomas participated in all of these activities, but the *Evergreen* supervisors also contacted employees at home. The supervisors in *Evergreen* also spoke often about the display of campaign buttons so that a nurse aide testified she did not want to wear a button but did so to "get them off my back." A supervisor told a nurse aide to wear the button and "help boost the union" and on the day of the election asked another nurse aide if she had voted for the Union, because if she would vote for the union they would have more benefits. The aide testified that she "went along with them [because they were] . . . my co-workers and I wanted to be able to work there." *Id.* at 877. In the present case, witnesses testified that they were contacted by Thomas but, nevertheless, refused to wear the pin or attend the union meetings. *Evergreen* found support in *NLRB v. River Walk Manor, Inc.*, No. 86-3887, 1987 WL 38910 (4th Cir. Oct. 26, 1987) (unpublished), which held that an election was invalidated by supervisory nurses at a union meeting encouraging employees to organize an effort to support the union; attending union meetings and distributing authorization cards; voicing support for the union directly to employees she supervised and soliciting union authorization cards from several employees. *See Evergreen*, 104 F.3d at 877.

Following the filing of the election petition, the supervisors continued to attend union meetings and urged employees to "stick together and vote yes for the union, because we will get better wages, better job security, and better benefits." After the NLRB ruled that the four nurses were supervisors and excluded them from voting

***Objectionable Conduct***

The participation of a supervisor in the campaign preceding a union election may undermine the employees' freedom of choice so much so that the election must be set aside. However, an election is not automatically invalidated when there has been pro-union activity by a supervisor. An election will be invalidated when the petitioner demonstrates that "the supervisor's conduct reasonably tended to have such a coercive effect on the employees that it was likely to impair their freedoms of choice in the election." *The party challenging the election need not introduce proof of actual coercion.*

*Evergreen Healthcare, Inc. v. NLRB*, 104 F.3d 867, 874 (6th Cir. 1997) (emphasis added, citations and quotation omitted). While the hearing officer and Board did not actually state that proof of actual coercion was required, Harborside contends that both erred by taking into account "that the conduct at issue 'did not have a coercive effect' and that there was no 'accompanying coercion.'"

To determine whether a supervisor's conduct reasonably tended to have such a coercive effect on the employees that it was likely to impair their freedoms of choice in the election, the Board and the circuit courts have considered the following two factors: *(1) the degree of supervisory authority possessed by those who engaged in the pro-union activity; and (2) the extent, nature, and openness of the pro-union activity.*

*Evergreen*, 104 F.3d at 874 (emphasis added).

Recently, the Board overturned a forty-three-year precedent and held that a union's use of a statutory supervisor as an election observer constitutes objectionable conduct. *See Family Serv. Agency*, 331 N.L.R.B. No. 103 (2000); *Paragon Rubber Co.*, 7 N.L.R.B. 965 (1938); *Plant City Welding & Tank Co.*, 119 N.L.R.B. 131, 132 (1957). These recent

decisions of the Board emphasize that the actions of a supervisor, on behalf of the union, are viewed seriously by the Board with respect to a tainting of the election process.

### 1. *Degree of supervisory authority*

*Evergreen* concluded that the nurses involved had significant supervisory authority which would likely have a coercive effect on employees. *See Evergreen*, 104 F.3d at 875. The Board in *Evergreen* found that the licensed and registered nurses were supervisors, but this court concluded the hearing officer failed to consider the extent of the nurses' supervisory power when determining whether their conduct invalidated the election. The hearing officer erred in noting

(1) the nurses' status as supervisory was undecided during the campaigning; (2) Evergreen treated the nurses as unit employees by allowing them to campaign; and (3) the employees did not believe the nurses were supervisors because they campaigned side-by-side. *None of these reasons, however, render the supervisory status of the nurses inconsequential.*

*Id.* (emphasis added).

In the present case the Board adopted the hearing officer's decision in which he assumed, without actually deciding, that Thomas was a supervisor. This fact was stipulated. Thomas had authority to exercise independent judgment, to make decisions in crisis situations, and to direct and discipline employees. The director of nursing testified to the nature of charge nurses' supervisory responsibilities, stating that they were the immediate supervisors of the nursing assistants and had the authority to initiate disciplinary action. In addition, charge nurses could direct nurses, assign nurses' schedules, make independent judgments, interview and recommend prospective employees, give the principal input on nursing assistants' evaluations (which affect retention and pay raises), immediately suspend and send home employees, request employees to stay over, and recommend suspension and

termination of employees. This is made clear by job descriptions. Union organizer Hope Carter, who stipulated LPNs as supervisors and therefore out of the unit, testified she did so to avoid a hearing on this issue, but Director of Nursing, Mogus, testified that Thomas was indeed a supervisor. Nicole Dennis, Regional Human Resources Director for Harborside, testified at the hearing that Thomas was in attendance as required at Harborside's meeting for supervisors at which they were told not to involve themselves on behalf of the Union. Unit manager Kirkwood said Thomas was present at a mid-September meeting of supervisors where this direction was reiterated. The hearing officer noted that Thomas had less supervisory authority than in other cases because of her lack of direct authority over the Harborside employee witnesses. One such employee, Pavelchak, worked for Thomas only one day but she testified that Thomas had the ability to write her up, send her home, and ultimately have her terminated. Nursing assistant Thyme, an employee, testified that Thomas occasionally was her supervisor and that she directed her and had authority to discipline her. Nursing assistant Frank Jackson testified that Thomas was directly over him on only one occasion but that she was a supervisor because she could "write you up and make you lose your job," and she gave him some directions.

### 2. *Extent, Nature, and Openness of Pro-union Activity by Thomas*

The hearing officer relied on Board cases where the Board held that supervisors' statements were simply expressions of their personal opinions and were not inherently coercive. In one case, the supervisors solicited authorization cards for the union and urged eligible voters to support the union at union meetings, and told them the union would protect their jobs, but the Board found that the supervisors did not make threats of retaliation or reward, and therefore the comments were innocuous expressions of personal opinion. *See Pacific Physicians Servs., Inc.*, 313 N.L.R.B. 1176 (1994). We have also stated that "[a] non-coercive pre-election poll does not