**WERTHAN PACKAGING, INC.,**
**Petitioner/Cross–**
**Respondent,**

v.

**NATIONAL LABOR RELA-**
**TIONS BOARD, et al., Re-**
**spondent/Cross–Petitioner.**

**Nos. 01–1794, 01–2029.**

United States Court of Appeals,
Sixth Circuit.

May 2, 2003.

478

Before KENNEDY and GILMAN, Circuit Judges; and SARGUS, District Judge.*

SARGUS, District Judge.

Petitioner—Appellant, Werthan Packaging, Inc. ["Appellant" or "Werthan"], seeks review of a decision of the Respondent—Appellee, National Labor Relations Board ["NLRB" or "the Board"] entered on May 17, 2001, certifying the Paperworkers, Allied–Industrial, Chemical and Energy Workers International Union ["PACE" or "the Union"] as the representative of Appellant's production and manufacturing employees working in Appellant's Nash-

---

* The Honorable Edmund A. Sargus, Jr., United States District Judge for the Southern District of Ohio, sitting by designation.

ville, Tennessee plant. Appellant's Petition for Review, pursuant to 29 U.S.C. §§ 160(e) and (f), was filed on June 16, 2001.[1] Appellee, the Board, filed a cross-application for enforcement of the NLRB's decision on August 1, 2001. PACE has intervened on behalf of the NLRB.

For the reasons that follow, the Board's application for enforcement of its August 1, 2001 order is GRANTED and the petition of Werthan seeking to vacate the Board's order is DENIED.

## I.

Appellant, Werthan Packaging, Inc., located in Nashville, Tennessee, is engaged in the manufacture of paper packaging, in particular, bags for pet food. On September 24, 1998, PACE filed a petition with the NLRB seeking to represent Werthan's production and maintenance employees at the Nashville plant. (J.A. at 494). Werthan objected to the proposed composition of the unit, asserting that it should also include human resources assistants, customer service representatives, sales representatives, a marketing manager, graphics coordinator and process planner. (J.A. at 497). The Board overruled the objections and the Regional Director directed an election, which took place on December 2, 1998. (J.A. at 504, 507). The results were 120 votes for union representation and 153 votes against. (*Id.*).

The Union filed objections to the election on the basis of company misconduct. A hearing was held and the NLRB determined that Werthan improperly solicited grievances from employees, promised employees increased benefits and wages for opposing unionization and improperly interrogated an employee. (J.A. at 514–24). The Hearing Officer recommended setting aside the election and holding a second election. Werthan filed objections to the decision, which were overruled by the Board. (J.A. at 527–30).

The second election took place on July 29, 1999. The results were 114 votes for unionization, 139 votes against and 51 challenged ballots which were of sufficient number to determine the outcome. (J.A. at 532). PACE filed objections to the election and a hearing was held to resolve the ballot challenges and objections. After seven days of testimony, a report and recommendation was issued. As to the challenged ballots, the Hearing Officer overruled 10 challenges, sustained 40 challenges, and deferred decision on one pending a determination on the individual's claim that he was discharged from employment unlawfully. In addition, the Hearing Officer sustained two of the Union's objections: first, that Werthan had solicited employees to report to management any evidence of purported union harassment; and second, that Werthan unlawfully attempted to pack the voter eligibility list with ineligible, anti-union employees. (J.A. at 571–72; 576–85). The Hearing Officer recommended that the election be set aside and a new election ordered. Werthan objected to the recommendation, but it was sustained on appeal. (J.A. at 592–97).

A third election was held on April 13, 2000. The results were 130 votes for unionization and 115 votes against. There were 14 challenged ballots, which were too few in number to be determinative. (J.A. at 599–600). Werthan filed objections alleg-

---

1. Also before this Court is a related issue concerning the Board's finding, also made on June 17, 2001, that the Appellant's refusal to bargain with the Union constituted an unfair labor practice ("ULP") in violation of 29 U.S.C. § 158(a)(5). Under 28 U.S.C. § 159(2), this Court also has jurisdiction over the appeal of the ULP, which is dependent on whether the order of certification was proper.

ing that the union "unlawfully bribed and induced, and effectively bought the support and votes of Werthan employees." (J.A. at 610). A one-day hearing was held. The Hearing Officer recommended overruling Werthan's objection on the basis that the alleged bribery occurred well before the "critical period" of the election. (J.A. at 646–47). The Hearing Officer rejected Werthan's claim that the union improperly reimbursed several employees for lost wages while testifying on behalf of the union at the hearing following the second election. (J.A. at 647–50). The Hearing Officer recommended that the NLRB certify PACE as the exclusive bargaining representative. (J.A. at 650).

Werthan objected to the Hearing Officer's recommendation and filed a motion to reopen the record and submit additional evidence. On January 31, 2001, the Board overruled the objections and adopted the Hearing Officer's findings and recommendations. (J.A. at 690–92). The motion to reopen was denied. (J.A. at 691). The Board certified PACE as the exclusive bargaining representative of the Appellant's production and manufacturing employees.

On February 5, 2001, PACE requested that Appellant bargain with it as the representative of the certified unit. (J.A. at 717). Werthan refused the request. (Id.). PACE then filed a charge with the Board, whose general counsel subsequently filed a complaint based on the charge. Werthan conceded its refusal to bargain, but took issue with the Board's decision to certify the union. (J.A. at 695–97; 699–701). On December 11, 2001, general counsel filed a motion for summary judgment to which Werthan failed to respond despite the issuance of a show cause order. (J.A. at 715–16).

On May 17, 2001, a decision and order was rendered, granting the motion for summary judgment on the basis that Werthan's refusal to bargain with the Union violated Section 8(a)(5) and (1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5) and (1). The Order of the NLRB requires Werthan to bargain with PACE upon request. (J.A. at 717). Werthan now appeals from the Order of the NLRB.

## II.

Werthan raises four issues on appeal: First, it contends that the NLRB abused its discretion in determining the appropriate bargaining unit. Second, Werthan asserts that the NLRB abused its discretion in setting aside the first and second elections. Third, it submits that the NLRB abused its discretion in failing to set aside the third election. Finally, Werthan argues that the NLRB abused its discretion in refusing to reopen the record and consider newly submitted evidence.

## III.

### Standard of Review

This Court reviews the NLRB's legal conclusions *de novo* and its factual findings under a "substantial evidence" standard. *Harborside Healthcare Inc. v. NLRB*, 230 F.3d 206, 208 (6th Cir.2000) (citations omitted). The latter standard has been explained as follows:

> The Board's findings of fact are conclusive if supported by substantial evidence. Evidence is substantial when it is "adequate, in a reasonable mind, to uphold the [Board's] decision." We must consider the record as a whole, including evidence that runs contrary to the Board's findings. Deference to the Board's factual findings is particularly appropriate where conflicting testimony requires the Board to make credibility determinations. The Board's applica-

tion of law to facts is also reviewed under the substantial evidence standard and "the Board's reasonable inferences may not be displaced on review even though the court might justifiably have reached a different conclusion had the matter been before it *de novo.*"

*Id.*, quoting *NLRB v. St. Francis Healthcare Centre*, 212 F.3d 945, 952 (6th Cir. 2000).

This Court has further held that:

A party who seeks to overturn the results of a representation election bears the burden of demonstrating that the election was conducted unfairly. To meet this burden, "the objecting party must demonstrate that 'unlawful conduct' occurred which interfered with the employees' exercise of free choice to such an extent that it materially affected the result of the election.'"

*Id.* at 951 (citation omitted).

The ultimate decision of the NLRB is reviewed for abuse of discretion. *Harborside Healthcare*, 230 F.3d at 208. With this standard in mind, the Court considers the issues raised by Appellant Werthan.

## 1. NLRB's decisions on the controlling unit

Under 29 U.S.C. § 159(b), the Board must determine whether "in order to assure to employees the fullest freedom in exercising the rights guaranteed by [the] Act, the unit appropriate for the purpose of collective bargaining shall be the employer unit, craft unit or subdivision thereof." In evaluating the appropriateness of a unit determination, the "community of interest" test is applied. *Armco, Inc. v. NLRB*, 832 F.2d 357, 362 (6th Cir.1987). Under this test, a number of factors are considered, including: "(1) similarity in skills, interests, duties, and working conditions; (2) functional integration of the plant, including interchange and con-

tact among the employees; (3) the employer's organizational and supervisory structure; (4) the bargaining history; and (5) the extent of union organization among the employees." *Id.*

In reviewing the NLRB's determination, this Court need only decide whether the chosen bargaining unit shares a "sufficient" community of interest. If so, then there can be no abuse of discretion on the part of the NLRB. *Bry–Fern Care Center, Inc. v. NLRB*, 21 F.3d 706, 709 (6th Cir. 1994).

Werthan first argues that customer service representatives should have been included in the bargaining unit because they are integral to the bag-manufacturing process and are supervised by Operations Manager Don Belmont, who oversees all aspects of production. Appellant further contends that customer service representatives are subject to the same schedule and benefits as production employees. The Board argues that the customer service representatives are more akin to sales representatives than to production workers. According to Werthan Senior Vice President of Sales and Marketing, William Pinkleton, customer service representatives occasionally travel with sales representatives to customer facilities and often have more contact with customers than sales representatives. (J.A. at 17). The Board contends that Werthan customer service representatives play no role on the production floor other than pursuing customer orders and complaints. (*Brief* at 53 n. 32). Thus, the Board asserts that customer service representatives have a greater community of interest with sales representatives than they do with production employees.

In considering the above-mentioned factors, we agree with the Board that customer service representatives have a greater

community of interest with sales representatives than with production employees. Thus, this Court finds no abuse of discretion on the part of the Board for excluding customer service representatives from the bargaining unit.

■ Appellant also contends that two plant clericals, Mark Lee Massa and Heather Fisher, should have been considered in the bargaining unit.[2] As the Board points out, however, Massa, a "Process Planner," spends no more than one hour per week on the production floor. Fisher, a "Credit Analyst," holds a bachelor's degree and has no contact with production employees. Fisher and Massa work in an office building separate from the production site. This Court finds no abuse of discretion in the exclusion of these individuals from the bargaining unit.

■ Appellant also contends that two Quality Assurance employees, Jacqueline Brown and George Lyon, should have been included in the unit. According to Appellant, Brown investigates customer complaints, examines defective bags, addresses quality issues and performs tests on bags. (J.A. at 558–59). Lyon and Brown work with production employees regarding quality assurance and they maintain a checklist which provides production employees with all necessary information to properly produce the bags. (J.A. at 322, 326–27). The Board points out, however, that both Brown and Lyon are salaried employees. Brown works closely with customers and sales representatives to resolve complaints regarding quality; she visits the production floor only sporadically. (J.A. at 558–59; 251–54). Lyon is a "Quality Engineer" and creates manuals for Werthan to use in the production process and also

serves on numerous management committees to help develop an efficient production process. (J.A. at 559–60). In light of the evidence, this Court finds no abuse of discretion in the Board's decision to exclude Brown and Lyon from the bargaining unit.

■ Appellant also contends that clerical purchasing employees, Gwen Patrick and Theresa Flemmings, should have been included in the unit. These employees purchase the paper and other materials necessary for the manufacturing process. They also maintain the inventory supply. (J.A. at 281, 284–86, 290, 296–301, 306–07). The Board points out that both these individuals are salaried employees. Patrick is a "Buyer" and Flemmings is an "Assistant Buyer." Both work in Werthan's business office and have only occasional contact with the bargaining unit. (J.A. at 275–83, 287–89, 553–54, 843–55). In light of this evidence, the Board did not abuse its discretion by excluding Patrick and Flemmings from the unit.

■ Finally, Appellant challenges the exclusion of John Waltz, "Technical Manager," and, George Brown, "Process Technician," from the unit. Waltz assists with the installation and maintenance of machinery to ensure that the production process runs smoothly. (J.A. at 343, 348–51). Waltz wears production-worker attire and reports to the production supervisor. (J.A. at 349, 351, 354). The Board points out that Waltz is a salaried employee with a bachelor of science degree and analyzes the machinery to develop new methods for increased production. Waltz does not himself operate or make adjustments to the machinery. (J.A. at 341–47, 544–45).

---

2. Massa, a former machine operator, is responsible for physical inventory counts and works with production employees to resolve discrepancies in counts. Fisher is responsible for verifying content of shipments to customers, keeping track of customer returns and tracking inventory.

Brown, also a salaried employee, keeps records of maintenance work to machinery and works with the maintenance department to repair and upgrade equipment. He also develops plans for new machinery. (J.A. at 229–41, 543–44). In light of the evidence, this Court finds no abuse of discretion on the part of the Board for excluding Brown and Waltz from the unit.

### 2. NLRB's decisions to set aside the first and second elections

■ Appellant argues that the Board abused its discretion in setting aside the first and second elections. This Court has observed:

> Congress has vested the Board with considerable discretion in supervising and regulating representation elections. In order to assure employees the greatest freedom of choice in the selection of their representatives, the Board strives to conduct representation elections in an atmosphere in which employees are free from pressure, coercion and undue influence from either the employer or the union. These "laboratory conditions" are necessary to gauge the free, uninhibited choice of the employees. When a party's preelection conduct unduly influences the result of an election, the Board has set aside such election and ordered a new one.

*Comcast Cablevision–Taylor v. N.L.R.B.*, 232 F.3d 490, 494 (6th Cir.2000) (internal citations omitted). A party seeking to overturn the results of a representation election bears the burden of demonstrating that the election was conducted unfairly. To meet this burden, the Appellant

> must demonstrate that unlawful conduct occurred which interfered with employees' exercise of free choice to such an extent that it materially affected the result of the election. While the Board strives to achieve laboratory conditions

during representation elections . . . this can be an elusive goal, and so elections are not automatically voided whenever they fall short of perfection.

*St. Francis Healthcare Centre*, 212 F.3d at 951 (citations omitted).

If there is substantial evidence in the record to support the Board's conclusions, this Court should not disturb the matter on appeal. *Comcast Cablevision–Taylor*, 232 F.3d at 494.

### The First Election

The Hearing Officer set aside the December 2, 1998 election upon a finding of misconduct on the part of Appellant Werthan. Specifically, the Hearing Officer concluded that Werthan improperly solicited grievances from employees, improperly interrogated an employee, and promised employees increased benefits and wages if they voted against unionization. (J.A. at 524). Appellant argues that this decision was an abuse of discretion.

First, Appellant contends that employee Martha Wolpink was not improperly interrogated. The record reveals that sometime in late November 1998, Werthan Vice President Don Belmont approached Wolpink on the job and asked her how people felt about the Union and what grievances they had. (J.A. at 517). In response, Wolpink stated that she could not speak for everyone but that she was concerned about the current retirement plan. (*Id.*). Belmont responded that the current pension formula which entitled employees to $4.00 per month for each year worked would be increased to $18.00 per month. (J.A. at 518). Belmont approached Wolpink a second time in late November 1998 and asked her if there were any questions he could answer. (*Id.*). Wolpink again expressed concern over pension and Belmont told her that the increase in retirement was in progress but that if the Union

won the election everything would have to be bargained. (*Id.*).

Appellant contends that because the record fails to include any mention of Wolpink feeling coerced, threatened or uncomfortable about the conversation with Belmont, the decision that Wolpink was unlawfully interrogated is not supported by substantial evidence. Appellant's argument is misplaced.

Section 8(a)(1) of the National Labor Relations Act prohibits an employer from soliciting grievances from employees when the solicitation " 'is accompanied by an express or implied promise of benefits specifically aimed at interfering with, restraining, and coercing employees in their organizational effort.' " *NLRB v. V & S Schuler Engineering, Inc.*, 309 F.3d 362, 369 (6th Cir.2002), quoting *ITT Telecom.*, 183 NLRB 1129, 1970 WL 26117 (1970). In view of the evidence that Belmont made representations to Wolpink regarding retirement benefits, there is substantial evidence to support the Hearing Officer's conclusion that Werthan violated § 8(a)(1).

The record reveals further instances of Werthan's solicitation of employee grievances. Senior Vice President Chris McCarthy approached employees and asked whether they were happy with everything and whether there were any changes the company needed to make. (J.A. at 58–59, 66–67). In addition, Belmont told at least two employees besides ·Wolpink that pension and health benefits would be remedied. (J.A. at 521–22). Based on the evidence of record, the Hearing Officer's determination that Werthan's conduct interfered with the employees' right to a free and untrammeled choice in the election is supported by substantial evidence.

Further, this Court should find that Werthan has failed to demonstrate that its presentation of increased benefits and wages was done for a lawful business reason. Werthan contends that an increase in pension benefits was put into motion as early as 1997—prior to any union campaign. Werthan contends that the increase was delayed due to poor financial forecasts. The Hearing Officer considered this argument, but concluded that the timing of the actions supported a desire to frustrate union activities. (J.A. at 521). This conclusion is supported by substantial evidence.

In sum, we conclude that the decision to set aside the first election was not an abuse of discretion.

### The Second Election

■ The second election, conducted on July 29, 1999 was set aside by the ALJ for two reasons: first. Werthan attempted to pack the unit with anti-union employees and, second, Werthan appealed to unit members to report pro-union coworkers. Appellant contends that these findings are not supported by substantial evidence.

As to the first issue, under the authority of *Excelsior Underwear, Inc.*, 156 NLRB 1236, 1966 WL 18282 (1966), Werthan was required to provide a list of voters' names and addresses to the Board, to the Union and any other party to the election, within seven days of the Board's order directing the election. As the Board explained the importance of such list in *Excelsior*, "by providing all parties with the names and addresses, we maximize the likelihood that all voters will be exposed to the arguments for, as well as against, union representation." *Id.* at 1241. The list was to be comprised of unit employees, *i.e.*, "production and maintenance employees, including group leaders, lead persons, truck drivers and plant clerical employees." (J.A. at 495–96). According to the NLRB. Wer-

than placed numerous individuals on the list who were not included in the unit.

The Hearing Officer found that there were 14 individuals on the list who were supervisors within the meaning of Section 2(11) of the NLRA, 29 U.S.C. § 152(11), and thus, were not eligible to vote. (J.A. at 576). The Hearing Officer further found that there were an additional 23 individuals on the list who lacked a community of interest with the unit. (J.A. at 577). As a result, the Hearing Officer concluded that the number of voters was inflated by ten per cent. (*Id.*).

The Hearing Officer considered witness testimony on the issue. The Director of Human Resources, James Packer, who prepared the *Excelsior* list, testified that his assistant was largely responsible for the list and that he checked it to ensure that customer service representatives were not included. (J.A. at 578). The Director conceded, however, that he did not know if some employees on the list were supervisors. (J.A. at 579). In addition, former Human Resources Manager Terri Barry testified that Werthan's CEO urged several employees, including herself, to vote despite the fact that they shared no community of interest with the unit. (J.A. at 579–80).

In light of the evidence presented, the Hearing Officer concluded that there was a "plan to pack the unit with ineligibles in order to dilute the union's support." (J.A. at 579).[3]

Appellant also challenges the Hearing Officer's conclusion that a flyer posted by

Werthan on employee bulletin boards improperly solicited employees to report pro-union co-workers to management. Appellant contends that the flyer was posted in response to complaints from employees that they were being threatened and harassed by PACE. (J.A. at 380–83, 428). The flyer, posted from July 13 to July 29, 1999, stated:

> We understand that PACE has tried to reach some of you at home, and may have bothered your families and children. We apologize for any inconvenience that these outsiders may cause you.... If you feel that you are being harassed, please let us know and we will do everything within our power to assist you.

(J.A. at 428). The flyers were posted above the employees' time clock, in their break room and above the water fountain.

The Hearing Officer rejected Appellant's attempt to justify the flyer and found that "all unit employees were exposed to the Employer's message that they should report being 'bothered' or 'harassed' by anyone related to PACE, and such a request by the Employer is not only an unfair labor practice, but also a basis to set aside the election conducted in this manner." (J.A. at 572).

Appellant argues that this finding is not supported by substantial evidence because it was not clear that all employees were subjected to the flyer and because the flyer clearly and unambiguously referred to harassment by PACE officials rather

3. The Board has also held that, given the importance of the *Excelsior* list, failure to comply with its requirements constitutes a basis for a new election. *Excelsior* at 1240. In this case, a list of employees was submitted by the employer to the union. The list, according to the hearing officer, deliberately included the names of employees ineligible to vote. Werthan argues, not without some

force, that the election was not effected by the exchange of an incorrect list. If the *Excelsior* issue were the only basis for a new elections, this issue would be more difficult. Because of other improprieties on the part of Werthan, described *infra*, this Court need not find that the *Excelsior* issue alone required a new election.

than to harassment by pro-union co-workers. The NLRB points out that the Hearing Officer rejected these arguments, finding that "employees reading [Werthan's] document reasonably could understand the language to be a request by [Werthan] to report incidents in which they felt that they were being 'harassed' by the campaign efforts of fellow employees as well as non-employee union agents." (J.A. at 594–95).

It is clear that a request by an employer which encourages employees to report co-workers union activity is a violation of § 8(a)(1) of the NLRA, 29 U.S.C. § 158(a)(1). This Court has observed that requests for employees to report claimed pressures fail to distinguish between coercive conduct and lawful organizing activity, thus inviting employees to report the names of any union organizers. An employer may prohibit union solicitation during working hours but may not do so during non-working time, absent special circumstances. *Publishers Printing Co. v. NLRB*, No. 95–6519, 96–5062, 1996 WL 742294 (6th Cir. Dec. 23, 1996). In view of this authority, the Board's conclusion regarding the flyer is supported by substantial evidence. This Court concludes that the decision to set aside the second election was not an abuse of discretion.

### 3. NLRB's Certification of the Union following the Third Election

■ Appellant challenges the decision of the NLRB to certify PACE after the third election, claiming that PACE unlawfully induced the support of Werthan employees and wrongfully paid employees to testify on behalf of the Union at a Board hearing after the second election. The third election was held on April 13, 2000 and resulted in 130 votes for unionization and 115 votes against unionization. There were also 14 nondeterminative challenged ballots. (J.A. at 599).

On April 19, 2000, Werthan filed an objection to the third election, claiming that PACE had unlawfully induced employee support by the giving of union jackets, professional football tickets, pizza and beer. (J.A. at 643). A hearing was held during which Appellant called two witnesses, both employees and agents of the union. (J.A. at 644).

The evidence revealed that during a one to two week period in late October to November 1998, prior to the *first* election, the union distributed embroidered union jackets to 6 or 7 employees; Jackets were also given to 5 or 6 additional employees who asked for them. (J.A. at 644). All jacket recipients were members of the union's in-house organizing committee. (*Id.*). Second, two weeks prior to the *first* election, in late November 1998, the union held meetings as often as three times a day at a local motel. At some of the meetings, pizza and beer were provided. (J.A. at 644). Third, in September or October 1998, prior to the *first* election, the union gave four tickets to a professional football game to one employee who was engaged in organizing activities. (J.A. at 645). The employee invited a co-worker to the game and sold the remaining two tickets to non-employees. (*Id.*). No football tickets were offered after the first election. (J.A. at 646). No jackets were distributed prior to the second and third elections. (J.A. at 645). There were, however, some meetings prior to the second election in July 1999 during which refreshments were served to employees. (J.A. at 646).

The Hearing Officer concluded that the foregoing events were of no moment because they did not occur during the critical period preceding the third election. The Hearing Officer's Report and Recommendation states:

It is well-settled that the critical period for a second (or third) election commences as of the date of the first (or second) election. *Star Kist Caribe, Inc.* 325 NLRB 304, 1998 WL 23246 (1998) (citations omitted).... [A]ssuming *arguendo* that the jackets, football tickets or beer and pizza would constitute objectionable conduct prior to the first or second elections, the remedy is a rerun election after a period during which laboratory conditions have been reestablished.... Since the jackets, football tickets and pizza and beer were distributed prior to the first and/or second election the remedy has already been imposed. Thus the third election remedied objection-able conduct which occurred prior to the second election just as the second election remedied conduct occurring prior to the first.

(J.A. at 647). This conclusion, adopted by the Board, is supported by substantial evidence and not an abuse of discretion.

Appellant also challenges the union's payment of lost wages to employees summoned to testify at an NLRB hearing held on the following dates: September 14, 15, 16, 17, 22, 23 and 24, 1999. Appellant challenges the payment of one day's wages to employees who testified for "only minutes." (*Appellant Brief* at 56). Appellant concedes that the employees remained at the hearing for the remainder of the day, but nonetheless contends that they should not have been paid for time they were not testifying. (*Id.* at 61).

The Hearing Officer concluded that the payments were not objectionable. The Hearing Officer found that there was no evidence to demonstrate that the union paid any employee more than what was lost in wages. (J.A. at 649–50). This finding is supported by substantial evidence. Furthermore, as the NLRB points out, while this Court has concluded that over-

payments to employees are suspect, *Plastic Masters, Inc. v. NLRB*, 512 F.2d 449 (6th Cir.1975), in this case, the employees received wages only for time lost from work.

This Court concludes that the Board did not abuse its discretion in certifying PACE after the third election.

### 4. NLRB's decision to disregard certain evidence and refusal to reopen the record

■ Finally, Appellant challenges the Hearing Officer's refusal to reopen the record after the hearing on August 29, 2000 regarding Appellant's objections to the third election. Appellant sought to reopen the record to present evidence that it claims was only recently discovered as to the Union's payment of lost wages to employees. (J.A. at 655). Specifically, Appellant sought to introduce a declaration of Werthan's Senior Vice President and Chief Financial Officer, Chris McCarthy, averring that four employees who testified at the September 1999 hearing, following the second election, had been paid lost wages for their attendance on the days that they testified and were placed on unpaid jury duty leave for dates they attended the hearing but did not testify.

The foregoing was not offered as record evidence, but was proffered on brief to the Hearing Officer. The Hearing Officer concluded:

I reject the proffer. A brief is not an appropriate vehicle to offer new evidence. The reason for the rule is obvious; to admit evidence outside the hearing itself is to circumvent due process. The Employer had every opportunity during the hearing which adjourned after only an hour and a half to produce all evidence it deemed relevant in the forum where testimony is subject to cross-examination and where documents

must withstand the tests of authentication and relevance. The testimony and documents and, indeed, the employees themselves were all available well before and throughout the hearing. The Employer could have submitted any or all of this material and presented any or all of the witnesses during the hearing.

(J.A. at 649).

Following the Hearing Officer's decision, Appellant moved to re-open the record. (J.A. at 654–58). The motion was denied on the basis that Appellant "has not presented extraordinary circumstances· warranting the reopening of the record, nor is there evidence that the Employer seeks to introduce newly discovered or previously unavailable evidence." (J.A. at 691). Appellant argues that these decisions were an abuse of discretion.

Under 29 C.F.R. § 102.48(d)(1), the Board may reopen the record to consider "newly discovered evidence." Evidence is "newly discovered" if it was in existence at the time of the original hearing and the party excusably failed to adduce it. *Seattle–First National Bank v. NLRB*, 892 F.2d 792, 797 (9th Cir.1989). The decision as to whether the record should be re-opened is reviewed for abuse of discretion. *Dayton Hudson Dept. Store Co. v. NLRB*, 987 F.2d 359 (6th Cir.1993).

Appellant offered no reason in its motion as to why the evidence could not have been presented at the hearing. Indeed, the basis for the hearing was to consider Appellant's objection that employees had allegedly received excess payment by the Union in exchange for testifying at the September 1999 hearing. The evidence should have be presented to the Hearing Officer in August 2000.

The decision of the Board to disregard the evidence submitted on brief and to not reopen the record following the Hearing Officer's Report and Recommendation was not an abuse of discretion.

## V.

For the foregoing reasons, the Petition for Review filed by Werthan is **DENIED**. The Cross Petition of the Board seeking enforcement of its Orders certifying the Union as the collective bargaining representative of Werthan's production and maintenance employees, together with its Order directing Werthan to bargain with the Union, is **GRANTED**.

KENNEDY, Circuit·Judge, dissenting.

I would reverse the hearing officer's decision to set aside the second election. First, I disagree with the majority and would find that the hearing officer's decision that the flyer distributed by Werthan was unlawful was not supported by substantial evidence. The flyer states, in its entirety:

We understand that PACE has tried to reach some of you at home, and may have bothered your families and children. We apologize for any inconvenience that these outsiders may cause you. Remember that you do not have to speak to them, you do not have to take their literature, and you do not have to be bothered by them. If you feel that you are being harassed, please let us know and we will do everything in our power to assist you. If they have already bothered you with their tactics at this point, when they are trying to impress you and win you over, imagine how bad it will be if you become contractually obligated to pay them to be your representative, and they no longer have to impress you.

The NLRB hearing officer determined that the flyer's language was ambiguous, and as such, was unlawful. He relied on cases in which an employers' communica-

tions to employees discussed harassment of employees by co-workers who supported the union. The cases on which he relied are easily distinguished.

In *Manno Electric, Inc.*, the notice prepared and displayed by the employer stated: "If you are harassed, or in any way overly bothered by Union organizers **or co-employees** trying to get you to sign cards or go to meetings, please contact me at once." 321 NLRB 278, 286, 1996 WL 276357 (1996), *aff'd without op.*, 127 F.3d 34, 1997 WL 589264 (5th Cir.1997) (emphasis added). Similarly, in *Nashville Plastic Products*, the employer "requested employees who were 'bothered' or 'harassed' **by other employees** advocating the Union to report it to management." 313 NLRB 462, 462, 1993 WL 501806 (1993) (emphasis added). In *Hawkins–Hawkins Co.*, the employer also told employees that if they felt harassed by **supporters of the Union,** they should inform management, who would then, take care of it." 289 NLRB 1423, 1423, 1988 WL 213883 (1988) (emphasis added). The NLRB's concern in cases where an employer warns employees about union activities, either verbally or by notice, is "the potential dual effect of encouraging employees to identify union supporters based on the employees' subjective view of harassment and discouraging employees from engaging in protected activities." *Id.*

The concern stated in *Hawkins–Hawkins* is not a concern in the present case. The flyer does not refer to co-workers or employees at all. Instead, the flyer refers to PACE and to activity that occurs offsite. The flyer is straightforward and is within the bounds of acceptable conduct. Accordingly, I would reverse the hearing officer's decision to set aside the second election on this ground.

Second, I disagree with the majority and would find that the NLRB hearing officer's decision to set aside the second election was not supported by substantial evidence with respect to his finding that Werthan's preparation of the *Excelsior* list was unlawful. On review, the NLRB hearing officer found that fourteen employees who were included on the list were supervisors and should not have been on the list. The hearing officer notes that the NLRB order granting Werthan's request for review provided that nine individuals, who had been found by the Regional Director to be supervisors, should vote subject to challenge. However, the hearing officer states that the order does not justify Werthan's placing five additional supervisors on the list, nor does it relieve Werthan of the responsibility for placing twenty-three other ineligible employees on the list. *Id.* The hearing officer reached this conclusion after determining that James Packer, the Director of Human Resources, was not credible when he testified that the additional names were placed on the list for the following reasons: (1) he directed Sheila Lay, his assistant, to prepare the list pursuant to the NLRB order; (2) he verified that customer services employees were not on the list; (3) he believed that the NLRB order directing Werthan to place nine supervisors on the list, subject to challenge, meant that other supervisors should be placed on the list as well; and, (4) after receiving a letter from PACE's Nashville Resident Officer, which named sixty individuals on the list who PACE intended to challenge, he did not review or amend the list because he did not know the list could be altered once it had been submitted to the NLRB.

The hearing officer also found the testimony of Terri Barry, Werthan's Human Resources Manager, to be credible. The hearing officer stated he used this credibility finding to discredit Packer to the extent that his testimony conflicted with

Barry's. Specifically, Barry testified that, despite her stated position that she could not and would not vote, various Werthan managers, including Packer, told her to vote anyway. Consequently, the hearing officer found that Werthan "entered into a deliberate scheme to 'pack the voting unit' and to 'pad the *Excelsior* list' with the specific intention of diluting the Union's strength." Notably, however, Barry was not named on the *Excelsior* list, nor does her testimony contradict Packer's stated reasons for placing the names on the list.

The hearing officer relied on *Maxi Mart*, 246 NLRB 1151 (1979) and *Trend Construction Corporation*, 263 NLRB 295, 1982 WL 23844 (1982), in support of his conclusion. In *Maxi Mart*, the NLRB found that the employer, a retail grocer, "packed the unit" with meat department employees "in an effort to expand the size of the voting unit in order to insure that the ballots of bona fide employees would be sufficiently diluted so their desire for union representation would be frustrated." 246 NLRB at 1160. However, *Maxi Mart* does not involve a challenged *Excelsior* list, nor does it support the hearing officer's conclusion in the case at bar that Werthan "packed the unit." In this case, the NLRB ordered that nine supervisors should be placed on the list and should vote, subject to challenge. Werthan complied, but also included additional supervisors who it deemed were "production support" and had a community of interest with the unit. In *Maxi Mart*, the employer actually hired and moved employees into the meat department contrary to the needs of the department. There is no allegation in this case that Werthan hired employees or moved employees into different positions so as to increase the size of the voting unit and, thus, possibly dilute the voting strength of bona fide unit members. As a result, *Maxi Mart* is distinguishable and does not support the hearing officer's conclusion.

The other case relied on by the hearing officer, *Trend Construction*, is similar to *Maxi Mart*, In *Trend Construction*, the NLRB found that the employer offered and paid new employees a special benefit to accept employment within the voting unit and employed them for the purpose of increasing the unit size and, thus, diluting the strength and frustrating the efforts of those employees who were in favor of union representation. 263 NRLB at 299. As with *Maxi Mart*, *Trend Construction* does not involve an *Excelsior* list, nor does it support the hearing officer's conclusion that Werthan's conduct in preparing the list violated §§ 8(a)(1) or (3) of the Act. *Id.*

In the present case, the hearing officer concluded that when legitimate voters appear at the polls only to see supervisors also in line to vote, the legitimate voters may conclude that selecting a collective bargaining representative is futile. This, he concludes, constitutes an unfair labor practice. His conclusion, while supported by some evidence, is not supported by substantial evidence. Nor is his conclusion supported by law relevant to the facts of this case.

An *Excelsior* list is a list of eligible voting employees that an employer must provide to the union, including the addresses and phone numbers for each eligible employee so that each may be contacted by the union. *Excelsior Underwear*, 156 NLRB 1236, 1239–40, 1966 WL 18282 (1966). The purpose of an *Excelsior* list is to provide employees "an effective opportunity to hear arguments concerning representation." *Id.* at 1240. In *Women in Crisis Counseling & Assistance*, the NLRB discussed the purpose of an *Excelsior* list:

> It is well settled that the *Excelsior* rule will not be applied mechanically. In determining whether an employer has substantially complied with the rule, the

Board has consistently viewed the omission of names as more serious than inaccuracies in addresses. This distinction derives from a consideration of the policies underlying the *Excelsior* rule. The Board devised that rule for two basic purposes: (1) to insure an informed electorate by affording all parties an equal opportunity to communicate with eligible employees, and (2) to expedite the resolution of questions of representation by minimizing challenges based solely on lack of knowledge as to the voter's identity.

312 NLRB 589, 589, 1993 WL 405066 (1993) (internal citations omitted).

In the present case, Werthan included employees on the *Excelsior* list who were later challenged and excluded from the bargaining unit. Based on the record, the purposes of the list were not thwarted by Werthan's overly-inclusive list. Only five additional supervisors were added, and they were undistinguishable from the nine authorized by the NLRB to vote. The remaining persons were clerical employees, some part of whose work interacted with unit employees.

*Women in Crisis Counseling & Assistance* also discussed the importance of ascertaining the employer's intent in providing the union with an inaccurate list: "In addition, the Board may set aside an election because of an insubstantial failure to comply with the *Excelsior* rule if the employer has been grossly negligent or acted in bad faith in providing inaccurate addresses." *Id.* In this case, the hearing officer found that Werthan provided its most accurate employee contact information to PACE, thus it had not been grossly negligent. The hearing officer, however, found that Werthan acted in bad faith by "enter[ing] into a deliberate scheme to 'pack the voting unit' and to 'pad the *Excelsior* list' with the specific intention of diluting the Union's strength."

Recently, the Sixth Circuit, in *NLRB v. V & S Schuler Engineering, Inc.*, held that: "When preelection conduct is claimed to have made a representation election unfair, the party seeking to overturn the election must show that unlawful acts interfered with employees' free choice and significantly affected the election results. The objector must show that the misconduct tended to prevent a fair election." 309 F.3d 362, 368 (6th Cir.2002)(citing *Harborside Healthcare, Inc. v. NLRB*, 230 F.3d 206, 209 (6th Cir.2000)). In this case, PACE made no showing and the hearing officer made no finding that the overly-inclusive *Excelsior* list interfered with Werthan employees' free choice and significantly affected the election votes. While Werthan employees voted against representation in the first two elections that were set aside, I cannot draw an inference that the voting was affected by the inclusion of employees on the list who were not eligible to vote or who voted subject to challenge. The nine supervisors that the NLRB ordered to vote subject to challenge were rightfully present to vote. Without testimony or other evidence that the presence of additional supervisors or other ineligible voters had a chilling effect on eligible voters or made them feel that seeking representation was futile, I cannot agree that there is evidence supporting the hearing officer's conclusory finding.

Based on the foregoing analysis, the hearing officer's determination that the second election should be set aside due to (1) an unlawful flyer and (2) an overly inclusive *Excelsior* list was not supported by substantial evidence and should be reversed. For these reasons, I respectfully dissent.